My name is Greg Wallace, and I represent Keith Cronin in the Social Security Disability Appeal. Mr. Cronin is 36 years old. He suffers from sub-average intellectual functioning. He has valid IQ scores in the 60s. He completed only the 8th grade in special education classes. He cannot read or write, and he's failed the GED test five times. Now, the ALJ found that Mr. Cronin is limited to simple unskilled work with incidental interpersonal contact. At step two of the ALJ's decision, he found that Cronin's sub-average intellectual functioning is a non-medically determinable impairment, and he did not go on and address then whether Mr. Cronin meets the criteria for an intellectual disorder under Listing 1205B. This is the new Listing 1205B. In the next case, I'm going to argue we're dealing with the old Listing 1205C, but this is the new one. The ALJ's decision should be reversed for three reasons. First, the ALJ's finding at step two did not excuse him from assessing Cronin's disability under Listing 1205B. Second, the ALJ's finding under Listing 12.11B did not replace the assessment under Listing 1205B2. And third, substantial evidence on the record as a whole does not support the ALJ's mental limitations. As to the first of these reasons, the ALJ applied the wrong legal standard at step two to find that Cronin suffers from borderline intellectual functioning rather than significantly sub-average intellectual functioning. The ALJ never considered the validity of Mr. Cronin's IQ scores. Both Dr. Caspel found his IQ scores to be valid. So what legal standard did the court use? The ALJ used the standard, he said that his significantly sub-average intellectual functioning is not a medically determinable impairment because Mr. Cronin lacked a diagnosis of intellectual disorder. There was no diagnosis of an intellectual disorder by an acceptable medical source. Now the diagnosis is required under Listing 1205A, but not under Listing 1205B. Under 1205B, the evidence of a significantly sub-average intellectual functioning is provided by the valid IQ scores between 60 and 70, and that's what Mr. Cronin had in this case. Dr. Caspel found that his IQ score, full-scale IQ score of 61, was valid and reliable, and Dr. Hobby indicated that his IQ score of 68 was probably reliable. Now this court in the Maresh case held that a diagnosis, now this was under the prior Listing 1205, but this court held that a diagnosis of mental retardation, which is now called intellectual disorder and disability, is not required because the Social Security Administration uses a different standard than the American Psychological Association, and this court in the Scott case explained that a diagnosis of borderline intellectual functioning does not necessitate a finding that the claimant does not meet Listing 1205. So the ALJ's reliance on the lack of a diagnosis of intellectual disorder from an acceptable medical source is the wrong legal standard. Now he applied that legal standard at Step 2, and because he determined that Mr. Cronin's sub-average intellectual functioning was not a medically determinable impairment, he did not go on and assess whether Mr. Cronin was disabled under Listing 1205B. Now as we explained in our brief, Mr. Cronin presented evidence that he has qualifying IQ scores, which meet Part 1. He also has plenty of evidence that his disorder manifested itself before age 22. So the ALJ should have considered specifically whether Mr. Cronin was disabled under Listing 1205B. He did not. What about the analysis that then is done in 12.11? Is there sufficient overlap that that resolves the 12.05B question? That brings me to my second reason here. And what the Commissioner argues is that because the B criteria under both of these listings, 1205B and which would be 1205B2 and 12.11B are the same, then the ALJ in effect made a finding and his error in not addressing Listing 1205B was harmless. That's what the District Court concluded. But that argument I think is flawed. By dismissing Mr. Cronin's intellectual disability as a non-medically determinable impairment at Step 2, the ALJ predetermined that the B criteria would not be met. If there is no significant intellectual, if there is no sub-average intellectual functioning at Step 2, then of course there is going to be no deficits in adaptive functioning at Step 3 due to sub-average intellectual functioning. In fact, Listing 12.11 applies only in cases of borderline intellectual functioning. It assumes that the claimant has no significantly sub-average intellectual functioning and only sub-average intellectual functioning. So how can there be deficits in adaptive functioning due to Mr. Cronin's intellectual disorder? So our argument here is simply this, that the ALJ's finding at Step 2 tainted his assessment of the B criteria under 12.11B. So that doesn't act as an adequate substitute for doing a full-blown analysis under Listing 12.05B. So he misapplied the statute, is that right, or the regulation? Yes, yes. He misapplied the regulation by not considering, when he reached 12.11, then his mind was already made up that Mr. Cronin does not suffer from significantly sub-average intellectual functioning. And because he addressed that under the wrong legal standard at Step 2. So how could he find, I mean, it makes no sense to say, well, he could have found significantly, he didn't find deficits in adaptive functioning arising from his significant sub-average intellectual functioning under 12.11B. Well, of course he's not going to find that, because he's already made up his mind at Step 2 that this intellectual disorder is a non-medically determinable impairment. So of course he's going to find that the B criteria are not met under 12.11B in that regard. So in this particular case here, we have the ALJ, there's sufficient evidence in the record to put the ALJ on notice that Mr. Cronin is potentially disabled under Listing 12.05B. He meets two of the three criteria there. The only question is the adaptive functioning. And the ALJ did not, because of his legal error at Step 2, did not then properly assess his adaptive functioning under Step 3. So the error here was not harmless in that regard. Now, the third reason we have, we offer today for reversal, is that even getting beyond the listing issues, substantial evidence on the record as a whole does not support the ALJ's mental limitations. The ALJ found, as I said, that Mr. Cronin can do simple, unskilled work with incidental and interpersonal contact. Mr. Cronin suffers, besides the intellectual disability, suffers from a bipolar disorder, from schizophrenia. He's on lithium, which is a pretty strong medication. He had a very traumatic childhood. He attempted suicide several times as a child. He was the victim of domestic violence, sexual abuse. He has panic attacks twice a week. He's very aggressive. Dr. Caspel, who examined him, stated that he is deteriorating into deeper depression and isolation. And Aaron Snodgrass, his treating therapist at Families Incorporated, concluded that he had multiple extreme and marked limitations here. The ALJ's assessment of the record evidence is very thin and cursory. For example, the ALJ repeatedly emphasizes that Mr. Cronin can manage finances, including balancing a checkbook and paying bills. Well, that's just simply not supported by the record. Pam Shockley, who testified at the hearing, said that he never had a bank account. Mr. Cronin's never had a bank account. Dr. Hobby says Mr. Cronin can't use a checkbook to pay bills because he doesn't know how and he can't spell. And finally, Mr. Cronin himself testified at the hearing that he cannot handle a bank account or use checkbooks. So the record evidence does not support the mental limitations found by the ALJ. For all of these reasons, we ask that this court... There's an indication throughout this record that minor stress causes Mr. Cronin to react in ways that are aggressive, unpredictable, and sometimes assaultive. And so it looks to me like if they're identifying some position in which he has to have, like, quote, minimal contact with others, and I think that chef's assistant or something was one of the jobs that they identified. I mean, really a guy who was terminated after four hours at a job for slamming his boss's head into the side of a wall repeatedly, that's a guy you're going to give knives to and have him hang around a kitchen? I mean, that seems to be really what we're left with. Yes, Your Honor. And they're saying that substantial evidence in the record should say that we should say that's all okay. Yes, Your Honor, that's exactly right. And that's a great point and we agree wholeheartedly. Thank you, Your Honors. Thank you, Mr. Wallace. Mr. Tucker. May it please the Court, my name is Eric Tucker and I represent Andrew Saul, the Commissioner of the Social Security Administration. As you've heard, this is primarily a dispute over the new mental listings criteria, not the old. Here, the ALJ properly applied the new listings for mental impairments and found that Mr. Cronin's impairments did not meet a listing. Appellant mistakenly argues that this case should be remanded because the ALJ didn't explicitly evaluate his impairments under 1205B. And this really goes against all the evidence in the file. The three psychologists we have in this case, none of them evaluate 1205B centers on intellectual disability or mental retardation. And so none of the psychologists that examined him did all the extensive testing. None of them found that he had intellectual disability or mental retardation as it was historically referred to as. In fact, Dr. Val, when he saw Dr. Val in 2011, he did a cognitive examination and found that Mr. Cronin did not have or had, he estimated that he had average intelligence. And then when he saw Dr. Caspel, again, he did have IQ scores in the 60s. However, after looking at the evidence and doing the testing, Dr. Val said he did not have mental retardation. He only had diagnosed him with a bipolar disorder. And then third, Dr. Hobby, and it's important with Dr. Hobby because Dr. Hobby came after the whole case, all the medical evidence was in the file and was the last person to see the claim, or Mr. Cronin. Dr. Hobby looked at the families, incorporated the treatment notes that he did receive, and did extensive testing. And after all this extensive testing, found that what claimant had or what Mr. Cronin had was borderline intellectual functioning and also a learning disorder. And specifically said that the adaptive functioning, the lack of education, showed that he did not have mental retardation. So to that point, we would say that not only is the argument against... If that's the case, why would 12-11 be preferred to 12-05 or be the appropriate position? As Mr. Wallace noted, you have two cases today. One's with the old listing 12-05 and one's with the new listings 12-05. The listings for the new mental listings are actually substantially different. In fact, under the old listings, you didn't even have 12-11. 12-11 for neurodevelopmental disorders is a new listings that they put in on January 17, 2017, right before this ALJ's determination. So on top of not having 12-11, you have the introduction. So if you look at those, if you compare the two, there's quite different. The 12-05 under the old listings and the 12-05 under the new listings. And in fact, under the new listings, you have the introduction to 12.0-0-0. And when it says, how are the listings for mental disorders arranged and what do they require? It says listing 12-05 is only to be applied to an intellectual disorder. So it's not to be applied to someone that has borderline intellectual functioning or someone that has a learning disorder. And in fact, under B, 12.0-0-B, it says which mental disorders do we evaluate under each listing? So under B-4, it says we evaluate intellectual disorders under 12-05. And 12-05 does not include mental disorders for neurodevelopmental disorders. That would be, as 12-11 explains, is borderline intellectual functioning. And also, excuse me, my mouth is a little bit dry, sorry about that. What I was saying is it includes borderline intellectual functioning and learning delays. So the structure of the listings, the new listings, and what they specifically say, and also the actual medical evidence is what determines why the ALJ in this particular case properly evaluate the case under the listings. Now, if point two that Mr. Cronin made was that the B criteria analysis under 12-11, if you found that 12-05 should have been addressed, that that is not enough. If you look at the B criteria, or what it's most commonly referred to as, it's exactly the same for 12-05 and 12-11. You have to have one extreme limitation or two marked limitations. That was another difference that the new listings versus the old listings. The old listings had a capsule definition and just said, significant limitations in adaptive functioning. Whereas the new listings add this section that explains that these adaptive functionings is not just significant, it needs to be significant. It has to be at least one extreme and two marked. So whether you call the impairment intellectual disability or borderline intellectual functioning, this ALJ looked at all the evidence. He did not ignore any of these doctor's opinions or doctor's examinations. He looked at their findings. He wasn't going to play doctor. He was actually relying on the experts, the psychologists, Dr. Val, Dr. Caspel and Dr. Hobby, for their determination, their medical findings. They had the objective evidence, medical findings, and they came up with the diagnosis, not the ALJ. Then you go on, not just to those consultant examiner's reports that did extensive testing. You look at the medical evidence in this particular file, the treatment record in this file. Plaintiff didn't come into this case alleging that he had mental retardation. In fact, none of the treatment records suggest that he has mental retardation or intellectual disability. He sought treatment for bipolar, anxiety, schizophrenia. What it shows is when he went to treatment in 2013, he almost immediately got better. Once he was on medication and seeing a doctor, he almost immediately got better. In fact, from May to about five months later, he discontinued treatment because he had met all of his treatment goals. Again, there was a long gap in treatment. He went from 2013 all the way to 2016 before he returned for any treatment. Again, he admitted that treatment had been effective in controlling his mental impairments. He wanted to be back on medication, and so he got back on medication. Again, the same thing happened. Almost immediately, he got better. May I get a water? I didn't want to knock it off. Sorry. As far as the medical evidence, this case shows that he was not diagnosed with an intellectual disability or mental retardation. He was diagnosed by the experts with borderline intellectual functioning and also a learning disorder. That goes along with what Counselor said. He did have a traumatic childhood. He did lack education. However, it was not mental retardation. It was a learning disorder and borderline intellectual functioning. I think that's true. One of the things that I looked at is we talked about in the medical treatment setting, they say, well, he met his established goals. These are minimal goals, though. I mean, it's like get out of the house like once a week, right? Be able to interact with somebody other than your brother or something, right? I mean, I don't have them on the top of my head. But when you look at them, they really don't look like goals that would actually lead you to employability. And so I actually was much more kind of hung up as I reviewed this record on the substantial evidence in the record to support the finding that there are jobs within the economy in significant numbers that he can hold, right? And mainly because I look at his explosive personality. I mean, he goes to the grocery store. No one lets him go to the grocery store because he gets anxious and breaks stuff. The only job that he's held for any significant period of time was because a family member employed him for some period of time. And then they throw up the towel and they throw in the towel and say, you can't take it anymore. Then we get him on another job and he beats his boss's head against the wall, right? I mean, these are not behaviors that you see every day. And they all seem to be tied to his inability to cope with minimal stress, right? And I'm trying to figure out what kind of a job there is in the world where you have no contact with outside persons and you have something less than minimal stress that you triggered into these explosive outbursts. Yes, Your Honor. So, obviously, my brief contains all the evidence that would support the RFC. I'll pull out. So, to your question, there may have been periods where this person would not have been employable. But the relevant period here is from 2011 until 2016. And so, what the relevant evidence shows in this particular case is when this person goes and gets treatment, when they're on medication, basically, it's really working well for Mr. Cronin. I mean, in 2016, it says, after treatment, this is just two months of treatment, euthymic mood, reported sleeping well, no irritability to anger issues. So, that would address, you know, some of you mentioned beating someone's head in the past. I mean, there is evidence that he went to prison different times. But that doesn't make him disabled. With treatment, this claimant has shown that his anxiety was under control. He was sleeping well. He had energy. He had good memory, judgment, and insight, and fundamental knowledge were all good. And, in fact, in August 2016, the last treatment record, he denied having any serious problems. So, you know, I can go through the medical evidence, but I don't think that's why you want me here. But this particular case shows that when he did get treatment, he did get better. And then, to answer your question, we have a, you know, plaintiff didn't raise a step five issue in this particular case. He raised RFC, the residual functional capacity. And the residual functional capacity is supported by substantial evidence. And this deck, it explains, the Supreme Court case that just recently came out explains that that's not a very high burden at all. It's a very differential burden. And there's more than enough evidence from the consultant examiners, the psychologists that examined him, and also the treatment notes that show how he got better to support that. And I'll pull out Dr. Hobby's findings. After he did the extensive examination of the claimant, or Mr. Cronin, he said he has no problems with his thought processes, no perceptual abnormalities. He exhibited good emotional control. Overall, Cronin had no difficulty following directions, no concentration problems, good persistence. He ultimately found that he had good communication skills, and that he could learn simple and semi-skilled work tasks. And in fact, the last pages of the transcript show that, considering the treatment notes that he evaluated, and also doing this extensive testing, that Dr. Hobby found that he only had mild to moderate functional limitations. So, and this goes along with the, also you can find support for the RFC in the, with the state agency doctor's opinions. They reviewed the evidence, and they also found that he could do simple work with incidental contact with others. So, to answer your question in full is, there's more than substantial evidence to support the RFC finding in this particular case when you look at the consult examiners, the state agencies, and even the treatment notes. And we didn't address Mrs. Snodgrass's opinion. I know counselor mentioned that that particular licensed clinical social worker made an opinion that he had extreme limitations or marked limitations. But the ALJ specifically looked at that opinion and found that it was entitled to little weight in the sense that it was totally inconsistent with the treatment note, her own treatment notes and progress notes. And I've already referred to those of how it showed he was working well, sleeping well, he had lack of anger issues. So those don't correspond to each other. And in fact, it's interesting enough with the Snodgrass opinion, she even doesn't, she's the counselor that saw him in 2016. She refers to these extreme and marked limitations not because of any intellectual disability, but because she says, on good days he has, he's doing pretty good, but bad days he does pretty bad. In the sense, if you look at that opinion, an intellectual disorder doesn't go up and down from day to day. It would be a constant. So even her opinion wouldn't support extreme or marked limitations based on her opinion. But again, the ALJ discounted her opinion. So I see my time is almost up. I would ask that this court affirm the decision, the listing level argument and also the RFC determination as it's supported by substantial evidence. Thank you, your honors. Thank you, Mr. Tucker. Mr. Wallace. May it please the court, I have just a couple of quick points to make on rebuttal. With respect to the listing issue, the commissioner makes the same argument that the ALJ relied on in error. Namely, that we can discount his IQ scores, we can discount the fact that Mr. Cronin has significantly sub-average intellectual functioning simply because he doesn't have a diagnosis of intellectual disability or mental retardation. That's contrary to this court's decisions in Moresh and Scott which explained that a diagnosis of mental retardation is not required in order to meet listing 1205. Now, in this particular case, Dr. Caspel concluded that his IQ score of 61 was valid, but she did not diagnose mental retardation. Dr. Hobby concluded that his IQ score of 68 was probably valid, but he diagnosed borderline intellectual functioning. I suggest that in this case, that the ALJ should have gone on to consider the particular requirements of listing 1205B and not simply rely, as the commissioner does today, on a couple of diagnoses that involve something at a slightly higher intellectual level, borderline intellectual functioning. That's contrary to this court's decisions in Moresh and Scott. Now, he also said that Mr. Cronin did not allege mental retardation. There's no place on the form when you file for your benefits to say what you are disabled from. And here, he submitted evidence of valid IQ scores showing significant sub-average intellectual functioning. Finally, as to his condition being controlled by medications, that's simply not the record evidence. Sometimes he's doing well, a lot of times he's not. In fact, Ms. Snodgrass said in September of 2016 that he had moderate impairment on good days, but severe impairment the majority of time. And she is the one that is treating him on a regular basis. Thank you, Your Honor. Thank you, Mr. Wallace. Thank you also, Mr. Tucker. We appreciate your providing argument to the court this morning on the issue in this case, and we'll take it under advisement. You may be excused.